# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT IOWA

|  |  |  |
|---|---|---|
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF FANSTEEL FOUNDRY CORPORATION f/k/a WELLMAN DYNAMICS CORPORATION, | ) ) ) ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 4:18 – cv – 00304 |
| v. | ) ) | |
| CURTIS J. ZAMEC II, BRIAN F.CASSADY, LEONARD M. LEVIE, EARL F. WHITE, TODD M. HYMEL, DAVID E LEITTEN, MARCUS COLLARDIN, 510 OCEAN DRIVE DEBT ACQUISITION, LLC, FANSTEEL, INC., WELLMAN DYNAMICS MACHINERY & ASSEMBLY, INC., FMRI, INC., FANSTEEL ENA USA, INC., JOHN DOES 1-20, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | | |

## COMPLAINT

Plaintiff, The Official Committee of Unsecured Creditors of Fansteel Foundry Corporation f/k/a Wellman Dynamics Corporation ("Plaintiff" and/or the "Committee"), by and through its undersigned counsel, hereby files this Complaint against the above-captioned defendants (collectively, the "Defendants").

## INTRODUCTION

This Complaint asserts causes of action against Defendants for breaches of fiduciary duties, aiding and abetting breaches of fiduciary duties, alter-ego (mere instrumentality), fraudulent conveyances, preferential payments, disallowance of claims, recovery of bankruptcy payments, recovery of a book account and unjust enrichment. The relevant factual history of this matter is

lengthy and set forth herein. Plaintiff seeks recovery in excess of $30,000,000 from the Defendants.

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1334, as these claims and causes of action arise pursuant to, *inter alia*, 11 U.S.C. §§ 502, 544, 547, 548, 549 and 550; the Iowa Bankruptcy, as defined herein, and the Iowa Bankruptcy Court's orders.

2.     This Court has personal jurisdiction over the Defendants, as all of the Defendants have had multiple, meaningful contacts in the State of Iowa relative to business activities and transactions which they availed themselves of and which have directly and adversely affected a significant business (Wellman Dynamics Corporation - "WDC"), creditors, agencies, employees, unions, taxing authorities, land, assets and others in the State of Iowa. The frequency and nature of these contacts are, in part, set forth herein.  The State of Iowa has an inherent interest in this action given the Iowa Bankruptcy, as defined herein, and the impact of the Defendants actions, omissions and other conduct upon a business, its employees and related constituencies in this State and upon the State of Iowa itself.

3.     Venue is proper under 28 U.S.C. § 1391(a)(2), as all or a substantial part of the events or omissions giving rise to the claims occurred in, and a substantial part of the property that is the subject of the action is (or was) situated in the Southern District of Iowa.

## THE IOWA BANKRUPTCY

4.     The Plaintiff brings this Complaint pursuant to, *inter alia*, that certain Order entered by the United States Bankruptcy Court for the Southern District of Iowa (the "Iowa Bankruptcy

Court") on August 28, 2018 [*Case No. 16-01825-als11, Docket Ref. No. 895*], granting the Committee standing to bring the claims set forth herein.

5.      WDC operated for decades as a foundry, producing helicopter parts for the aerospace industry, with a principal place of business (manufacturing plant) at 1746 Commerce Road, Creston, Iowa 50801 (the "Creston Property").

6.      WDC filed its voluntary petition for relief commencing Case No. 16-01825-als11 (the "WDC Bankruptcy Case") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code" or "Code") on September 13, 2016 (the "Petition Date").

7.      On the same date, Fansteel, Inc. ("Fansteel") filed its Chapter 11 Petition (the "Fanstseel Bankruptcy Case") and Wellman Dynamics Machining & Assembly, Inc. ("WDMA") filed its Chapter 11 Petition ("WDMA Bankruptcy Case") (collectively, the WDC Bankruptcy Case, Fansteel Bankruptcy Case, and WDMA Bankruptcy Case may, at times herein, be referred to as the "Iowa Bankruptcy").  A corporate chart of Fansteel and its divisions and affiliated entities is annexed hereto and incorporated herein as Exhibit "A."

8.      The Iowa Bankruptcy was filed after pre-bankruptcy attempts to sell WDC failed and Fansteel's lender, Fifth Third Bank ("Fifth Third"), sold the underlying credit facility to TCTM Financial FSC ("TCTM").

9.      Following a failed chapter 11 reorganization plan process in the Iowa Bankruptcy, WDC was forced to sell the majority of its assets in the WDC Bankruptcy pursuant to 11 U.S.C. 363.

## THE PARTIES

10.     Plaintiff is a Committee appointed by the United States Trustee's Office, Region 12, to represent the interests of creditors in the WDC Bankruptcy.

11.     Upon information and belief, defendant, Curtis J. Zamec II ("Zamec"), resides at 1470 Cherry Place, Mound, MN 55364.

12.     Zamec was an officer and director of Fansteel from 2008 through 2012 and of WDC from 2009 through 2012.  Zamec was a principal owner of Fansteel but it is believed that Zamec no longer owns shares in Fansteel.

13.     Upon information and belief, defendant, Brian F. Cassady ("Cassady"), resides at 510 Ocean Drive, Suite 501, Miami, Florida 33139.

14.     Cassady was an officer and director of Fansteel from 2008 through 2016 and of WDC from 2012 through 2016.  Since 2008, Cassady has been a principal owner of Fansteel.

15.     Upon information and belief, defendant, Leonard Levie ("Levie"), resides at 1465 E. Putnam Ave., Apt. 506, Old Greenwich, CT 06870.

16.     Levie has been a director of Fansteel from 2012 through the present. Since 2008, Levie has been a principal owner of Fansteel.

17.     Upon information and belief defendant, Todd M. Hymel ("Hymel"), resides at 1831 Park Skyline Road, Santa Anna, California  92705.

18.     Hymel was a director of Fansteel from 2008 through 2012.

19.     Upon information and belief, defendant, Marcus Collardin ("Collardin"), is a resident of California with an address at 821 Mason Street, San Francisco, California 94108.

20.     Collardin was a director of Fansteel from 2012 through 2016.

21.     Upon information and belief, defendant, Earl F. White ("White"), resides at 5793 Smithland Drive, Marion, Iowa 52302.

22.     White was an officer and director of Fansteel and WDC from 2009 through 2012.

23.     Upon information and belief, defendant, David E. Leitten ("Leitten") resides at 5820 Colorado Street, Duluth, MN 55804.

24.     Leitten was a director and officer of WDC from 2009 through 2012.

25.     Upon information and belief, defendant, 510 Ocean Drive Debt Acquisition, LLC ("510 Ocean"), is as a limited liability company organized under the laws of Florida with a registered address of 510 Ocean Drive, Suite 501, Miami Beach, Florida 33139.

26.     Upon information and belief, defendant, Fansteel, is a Delaware corporation with a principal place of business at 1746 Commerce Road Creston, IA 50801.

27.     Upon information and belief, defendant, WDMA, is a Delaware corporation with a last known principal place of business at 706 Willow Springs Lane, York, Pennsylvania 17406.

28.     Upon information and belief, defendant, FMRI, Inc. ("FMRI"), is a Delaware Corporation with an address at 10 Tantalum Place, Muskogee, Oklahoma 74403.

29.     Upon information and belief, defendant, Fansteel ENA USA, Inc. ("ENA"), is a Delaware Corporation.

30.     Defendants, John Does 1-20, are named herein as representatives of the Subsequent Transferees and other, as yet, unknown defendants to the Plaintiff who may be liable to Plaintiff for certain matters asserted herein.

31.     Hereinafter, the defendant-Officers and Directors of Fansteel may be referred to as the "Fansteel Ds & Os" and the defendant-Officers and Directors of WDC as the "WDC Ds & Os."

## FACTS COMMON TO ALL COUNTS

**A.    Fansteel's First Bankruptcy**

32.    On January 15, 2002, Fansteel and other debtors including WDC, filed voluntary petitions for relief under Chapter 11 of the Code (collectively, the "Delaware Bankruptcy") in the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court").

33.    On July 24, 2003, Fansteel filed a Chapter 11 Plan of Reorganization (as amended, modified, and/or supplemented thereafter, the "Delaware Plan"), which was confirmed by order entered by the Delaware Bankruptcy Court on December 23, 2003.

34.    Following the Delaware Bankruptcy, WDC remained a subsidiary of Fansteel. Fansteel also continued to operate American Sintered Technologies, Inc. ("AST"), located in Pennsylvania, and Intercast, Inc. ("Intercast"), located in Mexico.  See, Exhibit "A."

35.    Upon information and belief, upon emergence from the Delaware Bankruptcy, Fansteel's business operations were largely driven by revenue from Intercast.

36.    However, Intercast then lost its largest customer, John Deere, and its revenue was substantially reduced, causing financial distress to Fansteel.

37.    This forced Fansteel to look elsewhere for cash to pay its liabilities, including those substantial environmental liabilities which still saddled Fansteel upon its emergence from the Delaware Bankruptcy.

**B.    Environmental Obligations of Fansteel**

38.    The Delaware Plan was designed to, among other things, isolate WDC from highly burdensome environmental obligations of Fansteel and, in particular, a large monitoring, safeguarding and cleanup liability of Fansteel relating to severely contaminated property in Muskogee, Oklahoma ("Muskogee Property").

6

39.     Under the Delaware Plan, FRMI was formed as a special purpose entity to hold title to the Muskogee Property and fulfill all environmental obligations. FMRI had primary responsibility for the environmental liability at the Muskogee Property but Fansteel also remained liable.

40.     WDC was in no manner obligated for the environmental liability of Fansteel and FMRI associated with the Muskogee Property.

41.     Fansteel was required under the Delaware Plan to fund FRMI's environmental obligations directly and, if necessary, fund same from an established $2,000,000 "Decommissioning Trust."

42.     Funds in the Decommissioning Trust were to be used solely for payment of environmental liabilities associated with the Muskogee Property.

43.     Three unsecured promissory notes were made by Fansteel to FMRI requiring payments over time such that FMRI would have sufficient funds to deal with the environmental issues at the Muskogee Property.  The primary note required payments of $700,000 twice per year with a balloon payment of the balance due on December 31, 2013.  The secondary note required payment of $282,000 per year starting in January 2009.  The third note was a contingent note to be funded at a later date.

44.     Fansteel was the only entity obligated to fund FMRI and the Decommissioning Trust on a going forward basis.

45.     In 2010, FMRI was required to deposit into the Decommissioning Trust an insurance settlement payment in the amount of approximately $1,250,000.

46.     Instead of properly depositing the insurance settlement, Fansteel used it to fund its operations.

47.     In addition, Fansteel siphoned compliance funding from FMRI as numerous payments made by Fansteel to FMRI were rapidly returned by FMRI to Fansteel instead of being used as required relative to the Muskogee Property under the Delaware Plan and as required by the NRC.

48.     According to the NRC, in its *Order Modifying License* Docket No. 040-7580, License No. SMB-911 EA-17-102, Fansteel caused FMRI to become insolvent.

49.     According to the NRC, the environmental liabilities of Fansteel and FMRI at the Muskogee Property may be as high as or exceed $78,000,000.

50.     Under the Delaware Plan, WDC had no further liability for the Muskogee Property or any of Fansteel's independent obligations for that matter.

51.     Nevertheless, upon information and belief, more than $14,000,000 of WDC's assets were utilized by Fansteel to pay Fansteel's and FMRI's environmental obligations, including relative to the Muskogee Property, and this pattern continued durring the Iowa Bankruptcy.

## C.     <u>Environmental Obligations of WDC</u>

52.     WDC did remain obligated on certain environmental obligations of its own related to the Creston Property.

53.     At the time of its emergence from the Delaware Bankruptcy, the Creston Property was subject to regulatory issues by the NRC, EPA, and Iowa Agencies.

54.     The Creston Property has been listed under Wellman Dynamics/Fansteel as a hazardous waste site by the Iowa Department of Natural Resources since 1992.

55.     The Creston Property has hundreds of barrels of radioactive Thorium buried underground at the site subject to long-standing investigations, monitoring and remediation requirements by the NRC, EPA and Iowa Agencies.

56.     Upon information and belief, the buried Thorium dates back as far as the 1970s and was known to be an issue at the Creston Property for decades.

57.     In 2004, a RCRA Corrective Action Administrative Order on Consent was issued by the EPA relating to, inter alia, the landfill at the Creston Property which has been in use there since 1967.

58.     There is also a capped waste disposal pit at the site which was in use from 1965 through 1991. Various toxic contaminants were dumped into this pit over the years prior to sealing it with sand and cement in 1991.

59.     In 2008, RCRA inspections occurred at the Creston Facility, a Phase II remediation report was subsequently submitted to the EPA and a RCRA compliance investigation was done on site.

60.     It has been estimated that WDC has generated over the years 11,000 tons annually of foundry waste and, until 2014, all of that waste was apparently either buried on site or disposed of into the landfill on site.

61.     In 2011, the Creston Property was placed under an Administrative Action Order by the EPA.

62.     The magnitude of the remediation and compliance issues at the Creston Property has been estimated by experts to be as high as $25,000,000.

63.     Information and documents relative to the significant contamination and issues at the Creston Property are contained in the books and records of WDC and many are also publicly available on regulatory and other websites.

64.     Such information and records further reflect that from 2008, WDC spent very little on environmental matters, instead being required by Fansteel to contribute the brunt of its cash to the obligations and endeavors of Fansteel and the Fansteel Ds & Os.

65.     The accruing environmental obligations of WDC at the Creston Property were such that despite WDC's increasing revenue, at least one if not additional prospective purchasers "walked" upon conducting their due diligence relative to the Creston Property.

66.     These WDC environmental issues were not fully disclosed in the Iowa Bankruptcy, continued to burden WDC throughout the case and cost WDC and its creditors substantial sums during the Iowa Bankruptcy.

**B.     The PBGC Note**

67.     The PBGC filed three proofs of claims in the Delaware Bankruptcy.

68.     On December 19, 2003, in accordance with the Delaware Plan, Fansteel and the PBGC executed a certain settlement agreement resolving, *inter alia*, the PBGC's proofs of claims against Fansteel in exchange for the issuance of a note (the "PBGC Note"), which provided for a debt obligation of $9.5 million owed by Fansteel to the PBGC.

69.     The PBGC Note was an obligation of Fansteel, not WDC, and included a pledge of a security interest in, among other things, land, buildings, and equipment owned by Fansteel's Mexican affiliate, Fansteel de Mexico, S. de R.L. de C.V.

70.     The PBGC Note provided that it would be amortized over ten years, through five annual payments of $750,000, followed by four annual payments of $1,100,000, with a final payment of the remaining $1,900,000.  The PBGC Note contained a right to default interest at the rate of 8%.

71.     WDC was not an obligor on the PBGC Note or a collateralization party for the debt evidenced by the PBGC Note.

### C.     Zamec, Cassady and Levie Take Control of Fansteel

72.     Until 2009, Fansteel was a publicly traded company regulated by the SEC.

73.     Pursuant to the Delaware Plan, the board of directors following the Delaware Bankruptcy was to consist of five members, including, (i) the chief executive officer of Fansteel, (ii) an independent director selected by agreement of the NRC, the PBGC, and the Delaware Bankruptcy creditors' committee, (iii) a director selected by the NRC, (iv) a director selected by the PBGC and (v) a director selected by the Delaware Bankruptcy creditors' committee.

74.     Upon information and belief, subsequent to 2003, Fansteel largely complied with the corporate formalities dictated by the Delaware Plan and SEC reporting requirements.

75.     Then, in early 2008, the value of Fansteel's shares dropped.  At that time, Cassady, Levie, and Zamec began acquiring major holdings in Fansteel, and formed a "Control Group" for SEC reporting purposes.

76.     By June 19, 2008, Zamec, Cassady and Levie collectively owned about 69% of Fansteel.  Specifically, Zamec owned at least 10% of common stock, Cassady owned at least 29% of common stock and Levie owned as least 30% of common stock of Fansteel.

77.     Upon information and belief, Zamec, Cassady and Levie paid around $450,000 total for the stock of Fansteel.

78.     Pursuant to a certain Cooperation Agreement, dated June 10th, 2008 (as subsequently amended on June 12, 2008, the "Cooperation Agreement"), Zamec, Cassady and Levie executed written consent resolutions in lieu of a meeting for the appointment of new directors and otherwise agreed to vote their shares to take control of the Board of Directors and affairs of Fansteel.

79.     On or about June 13, 2008, the entire Board of Directors of Fansteel resigned, other than Gary Tessitore ("Tessitore"), the President and Chief Executive Officer who had previously helped guide Fansteel through the Delaware Bankruptcy.

80.     Zamec, Cassady and Levie appointed Zamec and Cassady to the vacated director positions of Fansteel along with Hymel.  Zamec was also appointed Chief Operations Officer.

81.     In the latter part of 2008, Tessitore, and R. Michael McEntee, the then Vice President and Chief Financial Officer, left Fansteel.

82.     In early 2009, Zamec took over Fansteel as President and/or Chief Executive Officer.

83.     Through subsequent transactions, Zamec, Cassady and Levie acquired approximately 90%, either directly or indirectly, of common equity shares of Fansteel.

84.     The Fansteel Ds &Os converted Fansteel from a publicly traded entity to a privately held one in late 2009.

**D.     Privatized Fansteel**

85.     Corporate observances changed markedly under Fansteel's and Zamec, Cassady and Levies' rule of WDC, including such basic failures as holding board meetings and keeping corporate records of matters such as minutes and resolutions.

86.     Corporate decisions, including those directly and negatively impacting WDC, were made at the top in isolation, with limited diligence, input and discussion.

87.     In sum, after the Fansteel Ds &Os took over WDC, Levie, Cassady and Zamec closely controlled WDC by first installing Zamec, and then Cassady, as Presidents and/or Chief Executive Officers of WDC, who then "operated" WDC and reigned over its other "officers" and "directors" and personnel without question.

88.     Puppet Officers and Directors of WDC, other than Defendants herein, had no decision making authority but were in place to essentially do as told by Zamec, Cassady, Levie and certain additional Defendants herein such as White and Leitten.

89.     Upon information and belief, WDC either had no board of directors in the true corporate sense or, if it did, they never met or acted as a real corporate board.

90.     Fansteel and WDC corporate records are devoid of evidence of board meetings, minutes, resolutions (other than those imposed by Zamec and Cassady on others) and other corporate formalities that one would expect.

91.     Zamec and Cassady operated Fansteel and WDC largely with complete autonomy, often making misguided, independent decisions on high level matters such as spending, incurrence of debt, and acquisitions and, frequently, contrary to advice of other officers and subordinates and without proper board approval.

92.     Transactions requiring WDC's cash and/or value were frequently imposed upon WDC in order to benefit Fansteel, its affiliates, the Fansteel Ds &Os and others, without corresponding benefit or value to WDC.

93.     Under the Fansteel Ds & Os' watch, WDC's cash and value was repeatedly utilized to (i) fund Fansteel's obligations, (ii) further the "pet" personal projects of Zamec, Cassady and Levie, which all either failed and/or continued to cost WDC large sums, (iii) benefit directly Zamec, Cassady and Levie, among others, all of which quickly rendered WDC insolvent and unable to pay its bills, remedy its longer-term liabilities and invest in its own capex and other business needs.

**E.      Fansteel Defaults on the PBGC Note**

94.      Prior to January 20, 2008, Fansteel made four timely $750,000 installment payments on the PBGC Note.

95.      After the Fansteel Ds & Os took control, Fansteel failed to make the fifth $750,000 installment payment due on the PBGC Note in January of 2009.

96.      Upon information and belief, the Fansteel Ds & Os were told that the payment to the PBGC was due and must be paid.

97.      Instead, certain of the Fansteel Ds & Os – namely Levie, Zamec and Cassady – seized on the opportunity to "make a buck" through their own newly-formed company by negotiating a discounted purchase of the PBGC Note, which had a then outstanding principal amount of $6,650,000 owed by Fansteel to the PBGC.

**F.      The PBGC Note Modification Agreements and Default**

98.      On January 23, 2009, the PBGC and Fansteel entered into a Note Modification Agreement (the "First Note Modification Agreement").  Pursuant to the First Note Modification Agreement, the PBGC permitted Fansteel to forbear from making its fifth payment on the Note from January 23, 2009 until April 23, 2009.

99.      In exchange for such forbearance, the parties modified the PBGC Note to include a section regarding restricted payments. Fansteel subsequently failed to make the $750,000 payment due on April 23, 2009.

100.      On September 15, 2009, the PBGC, JP Morgan Investment Management, Inc. (as the PBGC's agent), and Fansteel entered into a second Note Modification Agreement (the "Second Note Modification Agreement") in order to permit Fansteel to effectuate a reverse stock split and

subsequent repurchase of fractional shares to reduce the number of beneficial shareholders as part of a plan to deregister shares of common stock.

101.    Pursuant to the Second Note Modification Agreement, the PBGC permitted Fansteel to further forbear from making its fifth payment on the Note from January 23, 2009 until October 1, 2009.

**G.    510 Ocean and the Acquisition of the PBGC Note**

102.    On information and belief, on or about November 25, 2009, Zamec, Cassady and Levie formed 510 Ocean.

103.    510 Ocean used Cassady's personal address in Florida as its registered office.

104.    Zamec, Cassady and Levie were all listed as 510 Ocean's members.

105.    On or about December 22, 2009, 510 Ocean and the PBGC executed that certain Debt Sale and Transfer Agreement whereby 510 Ocean acquired the PBGC Note from the PBGC in exchange for, *inter alia*, 510 Ocean's payment of $1,350,000 to the PBGC.

106.    On or about December 22, 2009, the same day on which the Debt Sale and Transfer Agreement was executed, without proper board approval, Zamec, Cassady and Levie caused a transfer of $954,739.73 on account of WDC's cash which was then paid to 510 Ocean.   On information and belief, this transfer was on account of, *inter alia*, (i) the past due fifth installment payment of $750,000 under the PBGC Note with default interest and (ii) a $150,000 note arrangement fee.

107.    Subsequently, in January and February of 2010, two additional payments were made to 510 Ocean on account of the $1,150,000 sixth installment payment under the PBGC Note. The first payment was made on January 27, 2010 in the amount of $575,000.  The second payment was made on February 22, 2010 in the amount of $579,284.93.

108.     As a result, by February 22, 2010, 510 Ocean had received more than $2,050,000 an account of WDC's cash resulting in a substantial profit to Levie, Zamec and Cassady on the $1,350,000 that 510 Ocean apparently paid for the PBGC Note.

109.     Plaintiff is not aware of any proper disclosures or corporate approvals of this transaction for the benefit of insiders, 510 Ocean, Levie, Zamec and Cassady.

**H.     Fansteel Requires WDC to Guarantee the PBGC Note**

110.     Fansteel failed to make the remaining payments to 510 Ocean under the Note.

111.     On January 23, 2014, Fansteel entered into a forbearance agreement (the "Forbearance Agreement") with 510 Ocean regarding the PBGC Note. The Forbearance Agreement purported to give Fansteel the right to reschedule the remaining payment obligations under the PBGC Note.  However, in exchange for such ability to reschedule, 510 Ocean demanded guaranties and security pledges from WDC, WDMA, and ENA.  The guaranty and collateral pledges were addressed in a separate agreement (the "Guaranty and Collateral Agreement") which was executed on that same day.

112.     Cassady executed the Forbearance Agreement between Fansteel and 510 Ocean, not only for 510 Ocean, in his capacity as a managing member, but also for Fansteel in his capacity as President and the Chief Executive Officer.

113.     The Guaranty and Collateral Agreement was executed by and between Fansteel, WDC, WDMA, and ENA as "Guarantors." 510 Ocean was named as the "creditor."  Danette Miro ("Miro"), then-President of WDC, executed the Guaranty and Collateral Agreement on behalf of WDC.  Cassady executed the Guaranty and Collateral agreement on behalf of Fansteel, WDMA, and ENA.

114.    On information and belief, Miro had no part in such decisions, negotiations or preparation of the Guaranty and Collateral Agreement on behalf of WDC.  Rather, Miro followed the instructions of Cassady, who at the time was a Director and Officer of WDC, as well as the President and CEO of Fansteel.

115.    On further information and belief, Fansteel's books and records do not reflect any board approval of either the Forbearance Agreement or the Guaranty and Collateral Agreement.

116.    The Guaranty and Collateral Agreement provided that the Guarantors would pledge personal property as security for Fansteel's obligations under the PBGC Note as follows:

> Each Guarantor hereby grants to Creditor, as collateral security for the prompt and complete payment and performance when due of the Obligations, a security interest in all of the personal property of such Guarantor, wherever located, and now located, and now owned or hereafter acquired, including: (1) Accounts, including health-care insurance receivables; (2) Chattel Paper; (3) Inventory; (4) Equipment; (5) Instruments, including Promissory Notes; (6) Investment Property; (7) Documents; (8) Deposit Accounts; (9) Letter-of-Credit rights; (10) General Intangibles, including payment intangibles; and (11) any proceeds, products, increase, issue, accessions, attachments, accessories, parts addition, repairs, replacements and substitutes of, to and for all of the foregoing.

Nowhere in the Guaranty and Collateral Agreement did the Guarantors purportedly agree to pledge real property as security for the PBGC Note, nor did the Guarantors ever agree to voluntarily assume Fansteel's obligations under the PBGC Note.

117.    Upon information and belief, WDC received no consideration or benefit – direct or indirect – in exchange for its forced assumption of debt evidenced by the PBGC Note or its forced pledge of collateral to 510 Ocean.

I.      **510 Ocean Takes a Mortgage and Security Interest**
        **on  WDC's Real and Personal Property**

118.    Although the Guaranty and Collateral Agreement only required a pledge of WDC's personal property, a separate mortgage instrument (the "Mortgage") was executed by Miro, in her capacity as President of WDC, on or about March 22, 2014.

119.    On information and belief, Miro had no part in the negotiation or preparation of the Mortgage, had no input or decision making authority relative to the Mortgage, and was instructed by Cassady to sign the document.

120.    The Mortgage provided that WDC was required to fulfill Fansteel's obligations under the PBGC Note, which obligation was secured by liens on WDC's (a) land and buildings, (b) personal property and (c) revenues and income.

121.    The Mortgage further provided that WDC would "pay all amounts payable under the [PBGC Note] in accordance with the terms of the PBGC Note] when and as due and will timely perform all other obligations of [WDC] under the [PBGC Note]."

122.    The Mortgage stated that if WDC failed to make payments under the PBGC Note (a requirement imposed only by the Mortgage), WDC would be in default of the Mortgage, and 510 Ocean would have the right to accelerate the payment of all obligations secured by liens, take actions in accordance with the Iowa Uniform Commercial Code, or foreclose upon the assets secured by the liens.

123.    The Mortgage did not contain any provision stating the consideration that WDC received upon execution of the Mortgage and, in fact, WDC did not receive any consideration in exchange for its execution of the Mortgage.

124.    The resultant damages to WDC continue to be incurred to this day in the WDC Bankruptcy and beyond as a result of 510 Ocean's efforts to stymie confirmation of the WDC Plan and take out the remaining value of WDC from its creditors.

**J.      Twin Cities Transaction**

125.    In October of 2009, Fansteel was slated to buy Progress Casting Group's ("PCG") business assets for approximately $3,500,000.

126.    William Bieber ("Bieber") – the owner of PCG - was to receive substantial additional consideration in the form of royalties related to the sale transaction (the "Twin Cities Transaction").

127.    Fansteel was then removed from the purchase agreement ("Twin Cities APA") as the buyer and replaced by WDC as buyer, with Leitten designated as WDC's president for signature.

128.    The Twin Cities APA was amended further with a new buying entity, WD Twin Cities, Inc. ("WDTC"), which then purchased the assets of PCG.

129.    On information and belief, the Twin Cities transaction was largely, if not entirely, funded by WDC.

130.    Upon information and belief, Zamec was advised against moving forward with the Twin Cities Transaction as it was believed by others that the Twin City's business would not mesh well with WDC's business.

131.    Due diligence materials including financials, accounts receivable, inventory and costing demonstrated that PCG was losing money.

132.    Additionally, there was no synergies, as PCG used permanent molds which were not suitable for WDC's needs.

133.    At the time of the Twin Cities Transaction, PCG's workforce was on strike and PCG was being staffed by non-union employees.

134.    Nevertheless, Zamec, a Fansteel and WDC Director and Officer, caused WDC to fund the Twin Cities Transaction.

135.    To compound matters, Zamec and Leitten failed to take the minimum steps necessary to inquire and/or preserve the value of PCG assets being purchased by WDTC when they failed to negotiate or otherwise secure a lease extension for the Plymouth operations facility where PCG's business had been operating.

136.    Upon information and belief, the lease where the PCG business operated had a termination date shortly after closing.

137.    Post-closing, the landlord would not honor or renew the subject lease. Instead, Zamec elected to operate at the Plymouth facility in violation of the prior lease.

138.    Soon after the Twin Cities Transaction closed, notice was provided to Zamec requiring WDTC to vacate the Plymouth facility immediately.

139.    After WDTC failed to comply with the notice to vacate, the sheriff arrived at the Plymouth facility and required WDTC to vacate the premises.

140.    When transporting machinery and equipment out of the Plymouth facility, apparently multiple pieces of equipment broke, were damaged or otherwise rendered useless. Upon information and belief, the machinery was then sold as scrap metal.

141.    After WDTC vacated the premises, it lost all of its customers.

142.    The Twin Cities Transaction was an unmitigated disaster, resulting in the loss of the purchase price, loss of equipment value, customer issues, and lawsuits, including one that resulted in a judgment in an amount of $4,772,720, with post-award interest at the statutory rate

from January 2, 2014, in favor of Beiber (the "Bieber Judgment") against WDTC <u>and WDC</u> on account of the royalties.

143.    In total, records reflect that WDC funded the purchase and subsequent operation of WDTC for approximately $13,000,000. This is in addition to the Beiber Judgement which has cost, and continues to cost WDC and its creditors.

144.    WDC received no corresponding value for this substantial "investment" and, in fact, the financial drain to WDC from this debacle and the resultant Beiber Judgement, contributed heavily to WDC's financial woes which culminated in the WDC Bankruptcy.

**WDMA Transaction**

145.    In August of 2011, Fansteel purchased WDMA.

146.    At that time, WDMA only had one major customer, the United States Navy.

147.    Cassady was apparently the driving force behind Fansteel's acquisition of WDMA (the "WDMA Transaction").

148.    As with the Twin Cities Transaction, the WDMA Transaction was fraught with lack of proper diligence and forethought.

149.    Further, to the extent there were any anticipated potential synergies and cost savings as between WDMA and WDC, such synergies never materialized.

150.    Specifically, it was readily apparent that WDMA did not have the ability to machine WDC's castings.

151.    Upon information and belief, WDC's funds were used to pay for the entirety of the WDMA Transaction with little or no corresponding value to WDC.

152.    WDMA started bleeding cash almost immediately after closing on the WDMA Transaction.

153.    Upon information and belief, Cassady tried to keep secret as much of WDMA's operations and failures as possible.

154.    Upon information and belief, WDC was forced to provide over $8,000,000 in cash or value to WDMA until its eventual sale in bankruptcy.

155.    WDMA was sold to a buyer for virtually no cash in the WDMA Bankruptcy as it had little going concern value for its creditors and, of course, such sale realized absolutely no value for WDC or its creditors.

## L.    German Acquisition

156.    In 2013, despite Fansteel being insolvent, Fansteel, once again led by Cassady, acquired ENA Guss GmbH ("ENA Germany") (the "ENA Transaction"), an insolvent aluminum castings manufacturer in Germany, for 1,000,000 Euros.

157.    Upon information and belief, Cassady was a managing Director of ENA Germany.

158.    Fansteel, at the direction of Cassady, caused WDC to incur debt obligations for the ENA Transaction through a loan with Fifth Third Bank secured by German assets.

159.    Upon information and belief, Cassady was again advised against the ENA Transaction but was apparently "fueled" by competition with Levie, knowing that Levie allegedly had individually been pursuing the same company and was prepared to make an offer.

160.    After Cassady made what appears to be a unilateral decision to acquire the company, Fansteel and Cassady proceeded to fund ENA and, correspondingly, ENA Germany, with WDC's capital as ENA lost money.

161.    In 2015, upon information and belief, just two years after the initial acquisition, 99% of ENA was sold to Levie as part of his portfolio of companies in return for assumption or repayment of the loan balance with Fifth Third Bank.

22

162.     Upon information and belief, the purchase price paid by Levie was far less than the 2009 acquisition price that Levie was willing to pay for ENA.

163.     Upon further information and belief, at least part of ENA Germany remains an asset of Levie's portfolio under a different company name.

**M.     WDC's Operations**

164.     Following emergence from Chapter 11, WDC was to operate as a stand-alone entity.

165.     The projections supporting the Delaware Plan separated Fansteel and its subsidiaries' projected revenues from those of WDC.

166.     The Disclosure Statement accompanying the Delaware Plan defines "Reorganized Fansteel" as including all subsidiaries except WDC.

167.     WDC, however, was apparently jointly obligated with Fansteel for financing upon emergence from the Delaware Bankruptcy.

168.     In or around 2005, Fifth Third Bank provided a loan credit facility to Fansteel in the amount of $15,000,000 (the "Fifth Third Loan").

169.     WDC was jointly obligated for the Fifth Third Loan.

170.     Upon information and belief, the cash management system of Fansteel, and all of its affiliates, including WDC, was operated from a combined operating account arrangement.

171.     Upon information and belief, that combined operating account would be swept by Fifth Third pursuant to a loan formula which would then allow Fansteel's access to an amount of available credit.

172.     WDC, as the only significant profit center, supported the vast majority of the lending base with its revenue and assets.

173.     Despite providing the majority of revenue and assets to the lending base, WDC was consistently underfunded by Fansteel.

174.     Upon information and belief, Cassady did not permit other WDC Ds & Os and key personnel to speak to vendors or handle any cash disbursements.

175.     Upon information and belief, WDC often struggled to timely pay its vendors and provide product on a timely basis to its customers which included some of the larger companies in the world such as Bell Helicopter, Sikorsky, Rolls Royce and Boeing.

176.     Upon information and belief, due to its constant funding of the borrowing base for Fansteel and affiliates, WDC did not re-invest in itself by making reasonable expenditures for capex, environmental remediation or marketing.

177.     Despite WDC generating almost 70% of Fansteel's overall revenue, which had reached $87.4M by 2015, WDC was woefully underfunded.

178.     By the time of the Iowa Bankruptcy in 2016, the Fansteel Ds and Os has allowed Fansteel to "run up" a whopping $30,000,000 plus payable "inter-company" to WDC.

179.     Fansteel had no ability to repay this debt and the Fansteel Ds and Os knew this as it was being incurred.

180.     In fact, unfortunately for WDC and its creditors, Fansteel had no means to ever repay the inter-company debt due to WDC.

N.     **Fansteel's Insovlency and Corresponding Draining of WDC's Cash**

181.     Fansteel was in the zone of insolvency soon after emergence from the Delaware Bankruptcy.

182.     Fansteel was insolvent in 2008 when Zamec, Levie and Cassady acquired their controlling shares in Fansteel.

183.    From 2008 through 2016, the Fansteel Ds and Os, led by Zamec, Levie and Cassady, drained over $30,000,000 from WDC by systematically and regularly using WDC as a "cash cow" with little or often no corresponding value provided to WDC.

184.    Additionally, according to documents, it appears that there were about 29 loan amendments as between Fansteel and Fifth Third over a decade, some of which obligated WDC for increasing secured debt amounts to Fifth Third.

185.    As result, Fansteel not only took or otherwise used WDC's cash and/or value for pet projects and their own pockets, but also then (i) required WDC to provide cash for additional payments on Fansteel's debt, including payments of interest and other sums on the Fifth Third Loan and (ii) required WDC to further encumber its assets.

186.    Fansteel had no significant assets of its own but was an ownership entity of other divisions and affiliated companies. See, Exhibit "A."

187.    As a result of the continuous siphoning of WDC's revenue, Fansteel and its Ds & Os caused WDC to become insolvent as the Fansteel Ds and Os rapidly drained WDC of any liquidity in a continuation of their efforts to deplete WDC of its capital for their own devices, diverting funds WDC could have used to improve its business and avoid bankruptcy.

## O.    WDC's Bankruptcy

188.    In September of 2016, WDC was forced to file bankruptcy as a result of various factors, including the long-standing, continuous pillaging of the company by the Fansteel Ds & Os.

189.    At the direction of Levie, Fansteel and WDC spent the first months of the Iowa Bankruptcy feuding with TCTM (now the secured lender by assignment from Fifth Third) over use of TCTM's "Cash Collateral."

190.    Upon information and belief, TCTM offered Fansteel a DIP Loan which was refused by Levie.

191.    Throughout the proceeding, Levie evidenced a very public hatred for TCTM, apparently stemming from TCTM's acquisition of the Fifth Third Loan for nearly full value.

192.    The WDC bankruptcy estate incurred a huge liability for costs, fees and other sums as a result of Levie's vendetta against TCTM.

193.    Levie installed a new CEO for Fansteel and a CRO (corporate restructuring officer who was subsequently terminated) but remained behind the scenes of the decision making process for the Debtors.

194.    According to the proposed reorganization plan, other documents and testimony in the WDC Bankruptcy, Levie had agreed to put in at least $7,000,000 of new equity into WDC.

195.    This never materialized despite the terms of the plans filed by the Debtors ("Debtor Plans") and evidence presented.

196.    The Debtor Plans were to be additionally funded by new financing which also never materialized.

197.    The Debtor Plans did not fully disclose the extent of the environmental issues at the Creston Property (which were fully known to the Fansteel Ds & Os) and which caused the proposed lender to reduce the potential loan funding which ultimately never materialized in any event and the Debtor Plans were withdrawn costing the WDC estate and its creditors more time and expense.

198.    Eventually, WDC, TCTM and the Committee came to terms of the WDC Plan, which ultimately was consented to by all constituencies in the WDC Bankruptcy except, of course, 510 Ocean.

199.    510 Ocean objected to the WDC Plan, contending that $7,000,000 in proceeds from the bankruptcy sale of WDC's assets should be paid to 510 Ocean as a result of the Mortgage and Security Interest it saddled WDC with for no consideration as aforesaid.

200.    Levie, Cassady and Zamec continue, to this day, through 510 Ocean, to take actions, or fail to act, consistent with their fiduciary duties, costing WDC and its creditors which the Plaintiff represents, substantial sums.

## COUNT I

### Breach of Fiduciary Duty
### (Against Zamec)

201.    The Plaintiff incorporates all allegations of this complaint as if fully set forth herein.

202.    At all times relevant, Fansteel was insolvent.

203.    As a Fansteel D & O and a WDC D & O, Zamec owed a fiduciary duty to WDC by virtue of, inter alia, (i) WDC being a directly controlled subsidiary of Fansteel, which was actively managed by Zamec as WDC's President and/or Chief Operating Officer and (ii) WDC being one of Fansteel's largest creditors.

204.    The aforesaid fiduciary duties include, but are not limited to, duties of due care, loyalty and good faith.

205.    As thoroughly set forth above, Zamec continually breached his fiduciary duties to WDC by virtue of, but not limited to, the following:

(a)    Failing to act in the best interests of WDC;

(b)    Acting in a negligent and/or grossly negligent manner;

(c)    Acting with improper self-interest;

(d)    Acting in conflict with his duties;

(e)    Disregarding advice and information;

(f)     Preventing other fiduciaries and personnel from taking appropriate action;

(g)     Failing to implement appropriate safeguards;

(h)     Failing to observe corporate formalities;

(i)     Acting in bad faith; and

(j)     Otherwise taking such actions and/or failing to act as required under the circumstances.

206.     As a direct and proximate result of Zamec's breaches as aforesaid, WDC has been, and continues to be, damaged in excess of $30,000,000.

WHERFORE, Plaintiff demands judgment in its favor and against defendant, Curtis J. Zamec II, in an amount in excess of $30,000,000, together with costs, expenses and attorney's fees and such other and further relief as the Court deems appropriate.

## COUNT II

### Breach of Fiduciary Duty
### (Against Cassady)

207.     The Plaintiff incorporates all allegations of this complaint as if fully set forth herein.

208.     At all times relevant, Fansteel was insolvent.

209.     As a Fansteel D & O and a WDC D &O, Cassady owed a fiduciary duty to WDC by virtue of, inter alia, (i) WDC being a directly controlled subsidiary of Fansteel, which was actively managed by Cassady as WDC's President and /or Chief Executive Officer and (ii) WDC being one of Fansteel's largest creditors.

210.     The aforesaid fiduciary duties include, but are not limited to, duties of due care, loyalty and good faith.

211.     As thoroughly set forth above, Cassady continually breached his fiduciary duties to WDC by virtue of, but not limited to, the following:

(a)     Failing to act in the best interests of WDC;

(b)     Acting in a negligent and/or grossly negligent manner;

(c)     Acting with improper self-interest;

(d)     Acting in conflict with his duties;

(e)     Disregarding advice and information;

(f)     Preventing other fiduciaries and personnel from taking appropriate action;

(g)     Failing to implement appropriate safeguards;

(h)     Failing to observe corporate formalities;

(i)     Acting in bad faith; and

(j)     Otherwise taking such actions and/or failing to act as required under the circumstances.

212.    As a direct and proximate result of Cassady's breaches as aforesaid, WDC has been, and continues to be, damaged in excess of $30,000,000.

WHERFORE, Plaintiff demands judgment in its favor and against defendant, Brian F. Cassady, in an amount in excess of $30,000,000, together with costs, expenses and attorney's fees and such other and further relief as the Court deems appropriate.

## COUNT III

### Breach of Fiduciary Duty
### (Against Levie)

213.    The Plaintiff incorporates all allegations of this complaint as if fully set forth herein.

214.    At all times relevant, Fansteel was insolvent.

215.    As a Director of Fansteel and WDC, Levie owed a fiduciary duty to WDC by virtue of, inter alia, (i) WDC being a directly controlled subsidiary of Fansteel, which was actively

managed by Zamec and Casady at Levie's appointment and direction and (ii) WDC being one of Fansteel's largest creditors.

216.     The aforesaid fiduciary duties include, but are not limited to, duties of due care, loyalty and good faith.

217.     As thoroughly set forth above, Levie continually breached his fiduciary duties to WDC by virtue of, but not limited to, the following:

(a)     Failing to act in the best interests of WDC;

(b)     Acting in a negligent and/or grossly negligent manner;

(c)     Acting with improper self-interest;

(d)     Acting in conflict with his duties;

(e)     Disregarding advice and information;

(f)     Preventing other fiduciaries and personnel from taking appropriate action;

(g)     Failing to implement appropriate safeguards;

(h)     Failing to observe corporate formalities;

(i)     Acting in bad faith; and

(j)     Otherwise taking such actions and/or failing to act as required under the circumstances.

218.     As a direct and proximate result of Levie's breaches as aforesaid, WDC has been, and continues to be, damaged in excess of $30,000,000.

WHERFORE, Plaintiff demands judgment in its favor and against defendant, Leonard M. Levie, in an amount in excess of $30,000,000, together with costs, expenses and attorney's fees and such other and further relief as the Court deems appropriate.

## COUNT IV

**Breach of Fiduciary Duty**
**(Against Hymel)**

219.     The Plaintiff incorporates all allegations of this complaint as if fully set forth herein.

220.     At all times relevant, Fansteel was insolvent.

221.     As a Fansteel Director, Hymel owed a fiduciary duty to WDC by virtue of, inter alia, (i) WDC being a directly controlled subsidiary of Fansteel and (ii) WDC being one of Fansteel's largest creditors.

222.     The aforesaid fiduciary duties include, but are not limited to, duties of due care, loyalty and good faith.

223.     As thoroughly set forth above, Hymel continually breached his fiduciary duties to WDC by virtue of, but not limited to, the following:

(a)     Failing to act in the best interests of WDC;

(b)     Acting in a negligent and/or grossly negligent manner;

(c)     Acting with improper self-interest;

(d)     Acting in conflict with his duties;

(e)     Disregarding advice and information;

(f)     Preventing other fiduciaries and personnel from taking appropriate action;

(g)     Failing to implement appropriate safeguards;

(h)     Failing to observe corporate formalities;

(i)     Acting in bad faith; and

(j)     Otherwise taking such actions and/or failing to act as required under the circumstances.

224.     As a direct and proximate result of Hymel's breaches as aforesaid, WDC has been, and continues to be, damaged in excess of $30,000,000.

WHERFORE, Plaintiff demands judgment in its favor and against defendant, Todd M. Hymel, in an amount in excess of $30,000,000, together with costs, expenses and attorney's fees and such other and further relief as the Court deems appropriate.

### COUNT V
### Breach of Fiduciary Duty
### (Against Collardin)

225.     The Plaintiff incorporates all allegations of this complaint as if fully set forth herein.

226.     At all times relevant, Fansteel was insolvent.

227.     As a Fansteel Director, Collardin owed a fiduciary duty to WDC by virtue of, inter alia, (i) WDC being a directly controlled subsidiary of Fansteel and (ii) WDC being one of Fansteel's largest creditors.

228.     The aforesaid fiduciary duties include, but are not limited to, duties of due care, loyalty and good faith.

229.     As thoroughly set forth above, Collardin continually breached his fiduciary duties to WDC by virtue of, but not limited to, the following:

    (a)     Failing to act in the best interests of WDC;

    (b)     Acting in a negligent and/or grossly negligent manner;

    (c)     Acting with improper self-interest;

    (d)     Acting in conflict with his duties;

    (e)     Disregarding advice and information;

    (f)     Preventing other fiduciaries and personnel from taking appropriate action;

    (g)     Failing to implement appropriate safeguards;

32

(h)     Failing to observe corporate formalities;

(i)     Acting in bad faith; and

(j)     Otherwise taking such actions and/or failing to act as required under the circumstances.

230.    As a direct and proximate result of Collardin's breaches as aforesaid, WDC has been, and continues to be, damaged in excess of $30,000,000.

WHERFORE, Plaintiff demands judgment in its favor and against defendant, Marcus Collardin, in an amount in excess of $30,000,000, together with costs, expenses and attorney's fees and such other and further relief as the Court deems appropriate.

## COUNT VI
### Breach of Fiduciary Duty
### (Against White)

231.    The Plaintiff incorporates all allegations of this complaint as if fully set forth herein.

232.    At all times relevant, Fansteel was insolvent.

233.    As a Fansteel and WDC Officer, White owed a fiduciary duty to WDC by virtue of, inter alia, (i) WDC being a directly controlled subsidiary of Fansteel, which was actively managed by White as on officer of WDC and (ii) WDC being one of Fansteel's largest creditors.

234.    The aforesaid fiduciary duties include, but are not limited to, duties of due care, loyalty and good faith.

235.    As thoroughly set forth above, White continually breached his fiduciary duties to WDC by virtue of, but not limited to, the following:

(a)     Failing to act in the best interests of WDC;

(b)     Acting in a negligent and/or grossly negligent manner;

(c)     Acting with improper self-interest;

33

(d)     Acting in conflict with his duties;

(e)     Disregarding advice and information;

(f)     Preventing other fiduciaries and personnel from taking appropriate action;

(g)     Failing to implement appropriate safeguards;

(h)     Failing to observe corporate formalities;

(i)     Acting in bad faith; and

(j)     Otherwise taking such actions and/or failing to act as required under the circumstances.

236.    As a direct and proximate result of White's breaches as aforesaid, WDC has been, and continues to be, damaged in excess of $30,000,000.

WHERFORE, Plaintiff demands judgment in its favor and against defendant, Earl F. White, in an amount in excess of $30,000,000, together with costs, expenses and attorney's fees and such other and further relief as the Court deems appropriate.

## COUNT VII
### Breach of Fiduciary Duty
### (Against Leitten)

237.    The Plaintiff incorporates all allegations of this complaint as if fully set forth herein.

238.    At all times relevant, Fansteel was insolvent.

239.    As a WDC D &O, Leitten owed a fiduciary duty to WDC by virtue of, inter alia, (i) WDC being a directly controlled subsidiary of Fansteel, which was actively managed by Leitten as an officer and (ii) WDC being one of Fansteel's largest creditors.

240.    The aforesaid fiduciary duties include, but are not limited to, duties of due care, loyalty and good faith.

241.    As thoroughly set forth above, Leitten continually breached his fiduciary duties to WDC by virtue of, but not limited to, the following:

34

(a)     Failing to act in the best interests of WDC;

(b)     Acting in a negligent and/or grossly negligent manner;

(c)     Acting with improper self-interest;

(d)     Acting in conflict with his duties;

(e)     Disregarding advice and information;

(f)     Preventing other fiduciaries and personnel from taking appropriate action;

(g)     Failing to implement appropriate safeguards;

(h)     Failing to observe corporate formalities;

(i)     Acting in bad faith; and

(j)     Otherwise taking such actions and/or failing to act as required under the circumstances.

242.     As a direct and proximate result of Leitten's breaches as aforesaid, WDC has been, and continues to be, damaged in excess of $30,000,000.

WHERFORE, Plaintiff demands judgment in its favor and against defendant, David E. Leitten, in an amount in excess of $30,000,000, together with costs, expenses and attorney's fees and such other and further relief as the Court deems appropriate.

### COUNT VIII
**Aiding and Abetting**
**Breaches of Fiduciary Duties**
**(Against Fansteel Ds & Os)**

243.     The Plaintiff incorporates all allegations of this complaint as if fully set forth herein.

244.     The Fansteel Ds & Os substantially and knowingly participated in inducing, encouraging, assisting, and aiding and abetting the breaches of fiduciary duties committed by one or more of the WDC Ds & Os as aforesaid.

245.     By virtue of the foregoing, the Fansteel Ds & Os are liable for aiding and abetting the WDC Ds & Os' breaches of their fiduciary duties.

246.     As a direct and proximate cause of the Fansteel Ds & Os aiding and abetting such breaches as aforesaid, WDC has been, and continues to be, damaged in excess of $30,000,000.

WHERFORE, Plaintiff demands judgment in its favor and against the defendants, Fansteel Ds & Os, in an amount in excess of $30,000,000, together with costs, expenses and attorney's fees and such other and further relief as the Court deems appropriate.

### COUNT IX
### Alter Ego-Mere Instrumentality
### (Against Fansteel and the Fansteel Ds &Os)

247.     The Plaintiff incorporates all allegations of this complaint as if fully set forth herein.

248.     As thoroughly set forth hereinabove, the Fansteel Ds & Os utilized WDC as nothing more than an extension or instrumentality of Fansteel and themselves.

249.     Such actions included, but were not limited to:

(a)     Placing Fansteel Ds & Os in fiduciary positions with WDC who then operated WDC in bad faith, without regard for its best interests and primarily for the benefit of themselves, and Fansteel and its Ds & Os and owners.

(b)     Failing to observe corporate formalities for WDC (ie., no directors meetings, minutes or documentation of actions taken which proved detrimental to the company).

(c)     Operating WDC financially as nothing more than a cash contributor to Fansteel and its divisions and affiliates under one cash and financial system.

(d)     Obligating WDC for Fansteel's indebtedness and pledging assets of WDC for Fansteel's liabilities and indebtedness.

(e)     Operating WDC for the own personal benefit of the Fansteel Ds & Os to the detriment of WDC; and

(f)     Continuing to dominate and control WDC, including throughout the Iowa Bankruptcy, causing WDC and its creditors even greater damages.

250.    As a result of, but not limited to, the foregoing, instead of becoming a strong, independent company, WDC became nothing more than another bankrupt Fansteel company.

251.    The court should hold Fansteel and its Ds & Os strictly accountable for these actions and the debts of WDC, none of which would be due and owing today had Fansteel, and the Fansteel Ds & Os, permitted WDC to operate as an independent, profitable company.

252.    Fansteel, and the Fansteel Ds & Os, are the direct and proximate cause of the damages which WDC and its creditors have incurred in excess of $30,000,000.

WHERFORE, Plaintiff demands judgment in its favor and against the defendants, Fansteel and the Fansteel Ds & Os, in an amount in excess of $30,000,000, together with costs, expenses and attorney's fees and such other and further relief as the Court deems appropriate.

### COUNT X
**Fraudulent Transfers**
**(Against Fansteel, 510 Ocean, WDMA, FMRI, ENA and Subsequent Transferees)**

253.    The Plaintiff incorporates all allegations of this complaint as if fully set forth herein.

254.    In entering into intercompany transactions, WDC made payments, contributed value, incurred indebtedness, assumed obligations, and encumbered assets (the "Transfers") to or for the benefit of defendants, Fansteel, 510 Ocean, WDMA, FMRI, ENA and other insiders and

affiliated entities and persons including, but not limited to the Fansteel Ds & Os (collectively, the "Transferees") and their immediate and mediate transferees (the "Subsequent Transferees").

255.    WDC received less than a reasonably equivalent value in exchange for the Transfers which included, but were not limited to, the following:

(a)    Cash and/or value in an amount in excess of $30,000,000 from 2008 through the WDC Petition Date. An accounting of the inter-company transfers is annexed hereto as Exhibit "B."

(b)    Incurrence and servicing of debt to Fifth Third Bank and to 510 Ocean.

(c)    Encumbrances securing debt to Fifth Third and 510 Ocean.

256.    The Transfers described above were to or for the benefit of the Transferees.

257.    WDC was insolvent on the date that the Transfers were made or became insolvent as a result of such Transfers.

258.    WDC received less than reasonably equivalent value in exchange for the Transfers.

259.    On the dates that the Transfers occurred, WDC was engaged in business or transactions, or was about to engage in business or transactions, for which the property remaining with WDC would be unreasonably small in relation to the business or the transactions.

260.    On the date that the Transfers occurred, WDC intended to incur, or WDC believed or reasonably should have believed that WDC would incur, debts that would be beyond WDC's ability to pay as such debts matured.

261.    On the date that the Transfers described above occurred, WDC was not paying its debts as they became due.

262.     There exists at least one creditor whose claim against WDC arose prior to the date of the transactions described above, including Fifth Third Bank and its successor, TCTM.

263.     Upon information and belief, Subsequent Transferees, who were largely Insiders, did not receive such Transfers in good faith, for value, and/or without knowledge of the underlying voidability of such Transfers for the reasons set forth hereinabove.

264.     Pursuant to 11 U.S.C. §§ 548 and 544, the transfers described above were fraudulent as to WDC and WDC's creditors.

265.     Pursuant to Iowa Code Chapter 684.4 and the Uniform Voidable Transactions Act, the transfers described above were constructively fraudulent as to WDC and WDC's creditors.

266.     Upon information and belief, Fansteel also made one or more transfers to certain of the other Transferees in the same manner as those transfers made by WDC are described hereinabove.  Through this action, Plaintiff intends to avoid and recover all such fraudulent transfers, whether made by WDC, Fansteel, and/or any other Defendant.  During the discovery process, Plaintiff may learn of additional fraudulent transfers, and reserves the right to supplement this Complaint with such additional transfers as and when appropriate.

267.     By virtue of the foregoing, the Transferees and Subsequent Transferee's are liable to the Plaintiff for the amount and/or value of the Transfers.

WHEREFORE, the Plaintiff demands judgment against the Transferees and Subsequent Transferees, individually, jointly, severally, and in the alternative, as follows:

(a)     Declaring such transfers of assets from WDC or Fansteel to any Transferee as an avoidable and recoverable fraudulent transfer under 11 U.S.C. § 548;

(b)      Declaring such transfers of assets from WDC or Fansteel to any

Transferee as an avoidable and recoverable fraudulent transfer under 11 U.S.C. § 544 and Iowa's

Uniform Voidable Transactions Act ("UVTA");

(c)      Declaring that all such avoidable transfers are recoverable by Plaintiff

under 11 U.S.C. § 550;

(d)      Enjoining and restraining Defendants from selling, disposing of, or

otherwise taking action with respect to WDC's and Fansteel's assets;

(e)      Ordering return of the assets to WDC and Fansteel by the Transferees; or

(f)      Allowing levy and execution by Plaintiff upon the assets so transferred;

and

(g)      Awarding reasonable attorneys' fees, costs of suit, interest, and such other

and further relief the Court deems just and proper.

## COUNT XI
### Avoidance of Preferential Transfers
### (Against Fansteel and Subsequent Transferees)

268.      The Plaintiff incorporates all allegations of this complaint as if fully set forth herein.

269.      Within the year prior to the Petition Date, WDC made or caused to be made

Transfers to Transferees and Subsequent Transferees.

270.      As set forth above, WDC was insolvent on the date that the transfers were made.

271.      WDC had an interest in the Transfers.

272.      WDC was allegedly indebted to the Transferees at the time of the Transfers.

273.      The Transferees were insiders under the Bankruptcy Code and UFTA.

274.      The transfers were made to or for the benefit of the Transferees.

275.    As a result of the transfers as described above, the Transferees received more than they would have received (a) under a chapter 7 case; (b) if the transfers described above had not been made; and (c) if the Transferees received payment on account of such debt to the extent provided by the provisions of the Bankruptcy Code.

276.    By virtue of the foregoing and pursuant to 11 U.S.C. §§ 547 and 550, Plaintiff is entitled to (i) judgment avoiding the Transfers described above between WDC and the Transferees and from Subsequent Transferees and (ii) recovery of the Transfers and/or monetary value thereof.

WHEREFORE, the Plaintiff demands judgment against the Transferees and Subsequent Transferees, individually, jointly, severally, and in the alternative, as follows:

(a)     Declaring such transfers of assets from WDC or Fansteel to any Transferee as an avoidable and recoverable preferential transfer under 11 U.S.C. § 547;

(b)     Declaring that all such avoidable transfers are recoverable by Plaintiff under 11 U.S.C. § 550;

(c)     Enjoining and restraining Defendants from selling, disposing of, or otherwise taking action with respect to WDC's and Fansteel's assets;

(d)     Ordering return of the assets to WDC and Fansteel by the Transferees; or

(e)     Allowing levy and execution by Plaintiff upon the assets so transferred; and

(f)     Awarding reasonable attorneys' fees, costs of suit, interest, and such other and further relief the Court deems just and proper.

## COUNT XII
### 11 U.S.C. § 502(d) – Claim Disallowance
### (Against 510 Ocean)

277.     The Plaintiff incorporates all allegations of this complaint as if fully incorporated herein.

278.     510 Ocean has asserted a secured claim in the WDC Bankruptcy (the "510 Claim").

279.     The Plaintiff objects to the 510 Claim and intends to bring such objection to avoid the 510 Claim in the WDC Bankruptcy in its entirety.

280.     Pursuant to 11 U.S.C. § 502(d), the 510 Claim must be disallowed until all sums due and recoverable by 510 Ocean to the Plaintiff are paid by 510 Ocean in full.

WHEREFORE, the Plaintiff demands judgment against 510 Ocean disallowing the 510 Claim pursuant to 11 U.S.C. § 502(d), unless the amount of any judgment for avoidance of the Transfers as set forth hereinabove has been paid in full to the Plaintiff.

## COUNT XIII
### Recovery of Unauthorized Bankruptcy Payments
### (Against Fansteel, WDMA, FMRI)

281.     Plaintiff incorporates all of the allegations of the complaint as if fully set forth herein.

282.     During the Iowa Bankruptcy, certain payments were made by WDC to Fansteel and WDMA directly or for the benefit of others, including FMRI, under protest by the Committee, and the Committee's rights to object and recover those payments as unauthorized, were preserved by Order of the Bankruptcy Court.

283.    Certain payments made were not even authorized by the Bankruptcy Court and are recoverable under 11 U.S.C. § 549.

284.    Other payments are recoverable pursuant to the aforesaid preservation of rights of the Committee.

WHEREFORE, the Plaintiff demands judgment against the Transferees and Subsequent Transferees, individually, jointly, severally, and in the alternative, as follows:

(a)    Declaring such transfers of assets from WDC or Fansteel to any Transferee as an avoidable and recoverable unauthorized post-petition transfer under 11 U.S.C. § 549;

(b)    Declaring that all such avoidable transfers are recoverable by Plaintiff under 11 U.S.C. § 550;

(c)    Enjoining and restraining Defendants from selling, disposing of, or otherwise taking action with respect to WDC's and Fansteel's assets;

(d)    Ordering return of the assets to WDC and Fansteel by the Transferees; or

(e)    Allowing levy and execution by Plaintiff upon the assets so transferred; and

(f)    Awarding reasonable attorneys' fees, costs of suit, interest, and such other and further relief the Court deems just and proper.

## COUNT XIII
### Recovery on Book Account
### (Against Fansteel)

285.     Plaintiff incorporates all of the allegations of the complaint as if fully set forth herein.

286.     Fansteel remains indebted to WDC on a book account in excess of $30,000,000 according to the books and records of both companies.

WHEREFORE, the Plaintiff demands judgment against defendant, Fansteel, in the amount of $30,000,000, together with costs, expense, attorney's fees and such other and further relief as the Court deems just and proper.

## COUNT XIII
### Unjust Enrichment

287.     The Plaintiff incorporates all of the allegations of the complaint as if fully set forth herein.

288.     The Defendants herein have received cash and other value and benefit directly or indirectly from WDC for which WDC has not been justly compensated.

289.     As a result, Defendants have been unjustly enriched at the expense of and to the detriment of WDC.

WHEREFORE, the Plaintiff demands judgment against Defendants in an amount in excess of $30,000,000, together with costs, expenses, attorney's fees and such other and further relief as the Court deems just and proper.

Dated:   September 12, 2018

*/s/ Stephen M. Packman*
Stephen M. Packman
ARCHER & GREINER, P.C.
Three Logan Square
1717 Arch Street, Suite 3500
Philadelphia, PA 19103
Telephone:  (215) 246-3147
Facsimile:  (215) 963-9999
Email:  spackman@archerlaw.com

*/s/ Kevin H. Collins*
Kevin H. Collins (IA AT 0001671)
Nyemaster Goode, P.C.
625 First Street SE, Suite 400
Cedar Rapids, IA 52401
Tel:  (319) 286-7003
Fax:  (319) 286-7050
Email:  khcollins@nyemaster.com

*/s/ Kristina M. Stanger*
Kristina M. Stanger (IA AT 0000255)
Nyemaster Goode, P.C.
700 Walnut Street, Suite 1600
Des Moines, IA  50323
Tel:  (515) 283-8009
Fax:  (515) 283-8045
Email: kmstanger@nyemaster.com

**ATTORNEYS FOR PLAINTIFF**

215167018v2